**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**INTERNATIONAL BROTHERHOOD OF**
**ELECTRICAL WORKERS LOCAL 2088,**

        **Plaintiff,**

-vs-                                                **Case No. 6:05-cv-447-Orl-22DAB**

**COMPUTER SCIENCES RAYTHEON,**

        **Defendant.**
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motions filed herein:

| | |
|---|---|
| **MOTION:** | **IBEW LOCAL 2088'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 17)** |
| **FILED:** | **December 29, 2005** |
| **THEREON** it is **RECOMMENDED** that the motion be **DENIED**. | |
| **MOTION:** | **MOTION FOR SUMMARY JUDGMENT (Doc. No. 18)** |
| **FILED:** | **December 30, 2005** |
| **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**. | |

Plaintiff International Brotherhood of Electrical Workers Local 2088 ("the Union") filed suit against Defendant Computer Sciences Raytheon ("CSR") to enforce arbitration award FMCS#03-09169 issued by Arbitrator Bernard Marcus on March 25, 2004 (the "Arbitration Award"). The Union

alleges that CSR reassigned certain audio tape changing duties on weekends from one work center to another work center, which amounted to a consolidation of work centers in violation of the Arbitration Award. CSR contends that there is nothing to enforce and the Union is actually attempting to use the lawsuit to re-litigate issues which it lost before the Arbitrator when he ruled that the Union failed to meet its burden of proving that CSR had in fact consolidated the work centers or had any sort of monetary loss.

### *Standard of Review*

A party is entitled to judgment as a matter of law when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. PRO. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323. In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.

The Union brought suit under § 185 of the Labor Management Relations Act, 29 U.S.C. § 301, to enforce an arbitration award. Although the Eleventh Circuit has not issued a definitive opinion on whether the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*) applies in challenging an arbitrator's decision under a collective bargaining agreement, at least one other Middle District judge has held

that the FAA should be applied. *Barrington v. Lockheed Martin*, 2006 WL 66720, *6-*7 (M.D. Fla. Jan. 11, 2006) (Fawsett, C.J.).

Complaints to vacate, confirm, or enforce arbitration awards may be resolved on summary judgment.[1] *See, e.g., Drummond Coal Company v. United Mine Workers of America, District 20*, 748 F.2d 1495 (11th Cir. 1984). Arbitration is the "decidedly favored" means of resolving disputes arising under a collective bargaining agreement. *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 37 (1987). The law of the Eleventh Circuit "narrowly circumscribes judicial review of arbitration awards." *B.L. Harbert Intern., LLC v. Hercules Steel Co.*, __ F.3d __, 2006 WL 462368, *8 (11th Cir. Feb. 28, 2006). Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. *Misco*, 484 U.S. at 36. Where parties have contracted to have their disputes settled by an arbitrator rather than by a judge, "it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *Id.* at 37-38. "The laudatory goals of the FAA will be achieved only to the extent that courts ensure arbitration is an alternative to litigation, not an additional layer in a protracted contest." *Harbert*, 2006 WL 462368, *1.

The Supreme Court has advised that:

The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards.

*Id.* at 36-37 (citing *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 (1960)).

---

[1] The Union cited the district court's opinion in *Shields & Company v. Jean G. Bright*, 254 F.Supp. 2d 1253 (M.D. Fla. 2003), which was reversed by the Eleventh Circuit. *See* 99 Fed. Appx. 875 (11th Cir. March 30, 2004).

In arbitration cases, the authority to make findings of fact about the dispute or to interpret an agreement resides solely with the Arbitrator. *Sullivan, Long & Hagerty v Local 559 Laborers' Intern. Union,* 980 F.2d 1424, 1429 (11th Cir. 1993) (citing *Misco,* 484 U.S. at 39). Particularly for labor disputes, federal judicial review of the contractual mediation of the dispute is extremely narrow due in part to the strong federal policy favoring the private and efficient resolution of labor disputes. *Id.* at 1426. Based on this policy, "arbitral awards enjoy a strong presumption of finality in the labor arena." *Id.*

Section 9 of the FAA provides that a party may apply for an order confirming an award within one year of the award's issuance[2], and thereafter the court must grant such an order, unless the award is vacated, modified or corrected. 9 U.S.C. § 9. Because the parties have filed cross Motions For Summary Judgment, which are substantially intertwined both factually and legally, the Court discusses and addresses the issues raised and the arguments presented by both parties, rather than addressing each Motion separately.

---

[2]CSR did not raise, and the Court does not address, whether the FAA's one-year limitations period or the one-year state limitations period applied in this case. *See United Paperworks Intern'l Local 395 v. ITT Rayonier*, 931 F.2d 832 (11th Cir. 1991) (applying state one-year statute of limitations applicable to suits for specific performance rather than six-month statute of limitation). *Cf. Southwest Florida Area Local American Postal Workers Union AFL-CIO, Inc. v. U.S. Postal Service*, 143 Fed. Appx. 154, 155 (11th Cir. 2005) (union's action to enforce arbitrator's award barring reduction in break times was barred by the six-month statute of limitations period contained in 29 U.S.C. § 160(b)); *and Samples v. Ryder Truck Lines, Inc.*, 755 F.2d 881, 888 (11th Cir. 1985) (union member's action to enforce arbitration award was time-barred by six month limitation period). Any timeliness objection to the Union's Complaint (if even applicable) is now waived. *See National Labor Relations Board v. A.E. Nettleton Co.*, 241 F.2d 130 (2nd Cir. 1957) (statute of limitations in § 160(b) is not jurisdictional and may be waived).

*Background Facts[3]*

CSR is a joint venture of Computer Sciences, Inc. and Raytheon, Inc., that performs support work at the Air Force Eastern Range under federal government contract. Doc. No. 17-3 (Arbitration Award) at 9. It tracks manned and unmanned rocket launches, and maintains instruments at various sites along the Eastern Seaboard, such as Cape Canaveral, John F. Kennedy Space Center, Patrick Air Force Base, other Florida mainland satellite locations and Antigua in the Caribbean. *Id.* CSR employs approximately 300 employees in the Union's bargaining unit, who are governed by a Collective Bargaining Agreement. *Id.* at 9-10. Under the contract, a person assigned to a particular seniority group may not be detailed to work in any other seniority group, even temporarily, except as specifically permitted under the Agreement. *Id.* at 11. In contrast, employees assigned to a work center[4] may be temporarily assigned to work in another work center, so long as the assignment remains within the employee's seniority group. *Id.* Because an employee's shift preference, promotion, vacation selection and overtime distribution are determined by his or her assignment to a work center, combining three work centers could dilute employee rights. *Id.* Over the years since 1995, there have been modifications to the list of work centers always (according to the Union) by agreement between CSR and the Union. *Id.* at 12.

On May 8, 2002, CSR proposed in a meeting with Union representatives to combine the three work centers into one; on May 23, 2002, CSR sent a letter to the Union outlining its intent to implement the new combination within thirty days and invited discussion with the Union. *Id.* at 13-

---

[3] The facts are taken from the Arbitration Award, given the deference required to be shown to the arbitrator's view of the facts. *See United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 37-38 (1987).

[4] Work centers are subgroups within seniority groups under the parties' Collective Bargaining Agreement which are organized for the purpose of determining shift preference, promotions, vacation selection and overtime distribution among the represented employees. Doc. No. 17-4 § 9.12(B)(2)).

14. The Union objected and a meeting took place between the parties on June 6, 2002, but no agreement was reached and, over the next several months, the "parties salvoed each other with written manifestos." *Id*. at 14.

On August 28, 2002, the Union filed a grievance alleging that CSR unilaterally planned to combine three work centers – Comm Electronics, XY Tech Control and Wideband – into a single work center and actually did combine them on August 3, 2002. *Id*. at 12-13. CSR took the position that, while CSR was authorized to do so, it had not yet consolidated the work centers, so there could not be any affected employees. *Id*. at 14 n.4.

The matter proceeded through the grievance process to arbitration on November 20, 2003. The On March 25, 2004, the Arbitrator issued his Arbitration Award (Doc. No. 17-3) describing the issue as:

> Did the Company violate the Collective Bargaining Agreement between the parties by undertaking, in mid-contract, to effect changes in employees' work center assignments, or by its conduct regarding its desire to consolidate three work centers into one, without agreement of the Union? If so, what should the remedy be?

*Id.* at 2. He determined that:

> The Company does not have the right, absent written consent from the Union, to alter the number or function of any work center which existed on the effective date of the 9/1/00-8/31/03 Collective Bargaining Agreement (September 1, 2000). . . . The Company shall make whole any bargaining unit employee who, as a result of his work assignments subsequent to May 8, 2002, has been adversely impacted with respect to shift preference, promotion, vacation selection and/or overtime distribution.

*Id.* at 21. The Arbitrator also determined that, while CSR was not entitled to unilaterally combine the work centers, the Union failed to establish that CSR had actually implemented the combination of the work centers. *Id.* at 19.

The Arbitrator also found that, while the Union sought a monetary remedy for employees who it claimed were adversely impacted by the alleged consolidation of the work centers, there was "no record evidence on which a monetary remedy can be computed." *Id.* at 20. The Arbitrator retained jurisdiction for 60 days to assist the parties with compliance. *Id.* at 21-22.

*Application to the Facts*

The Union filed this suit seeking to enforce the Arbitration Award, asking the Court to require CSR to return tape changing duties on weekends from the XY Tech Control work center back to the Comm Electronics work center. The Union contends that CSR failed to comply with the Award by using employees from the Tech Control Work Center to perform tape changes on Dictaphone Voice Comm Recording equipment operated and maintained by employees of the Comm Electronics Work Center, which reduced overtime for Comm Electronics employees. Doc. No. 17-1 at 2.

According to the Union (and undisputed by CSR), prior to August 2002, employees of the Comm Electronics Work Center had operated and maintained CSR's dictaphone equipment. Doc. No. 17-6 (Judah Decl.) ¶¶ 9-10. When tape changes were made on weekends, Comm Electronics employees were called in and – even though the actual change takes five minutes – the employees were guaranteed a minimum of four hours of pay at an overtime rate and were required to remain on station that long. *Id.* ¶ 9. Since July 2002, CSR has used employees of the Tech Control work center who are scheduled to work on weekends to change tapes on the dictaphone equipment, while continuing to use Comm Electronics work center employees to change tapes during the week. *Id.* ¶ 9. According to the Union (and disputed by CSR), this has resulted in loss of overtime to employees of the Comm Electronics Work Center in an amount between $27,405 and $29,038. *Id.* ¶ 10.

It is undisputed that the Arbitrator found that the three work centers in the XY building had not yet been combined as of the date of the Award, March 24, 2004. Doc. No. 17-3 at 19 ("the Union has not established by a preponderance of the evidence that the Company actually implemented combination of the three work centers"). However, the Arbitrator went on to order CSR to "make whole any employee whose shift preference, promotion, vacation selection and/or overtime distribution has been adversely impacted." *Id.* at 21. He reserved jurisdiction for sixty days to allow the parties to bring disputes over damages back to him.

The Union contends that even though it did not return to the Arbitrator within the 60 day period over the tape-changing issue that first arose in May 2002, this does "not negate the union's right to seek enforcement from the court in the event that the company failed and refused to comply." Doc. No. 17-1 at 10. CSR contends that the Arbitrator heard and rejected the Union's argument that the re-assignment of the tape-changing duties was evidence of CSR's unilateral consolidation of the work centers in ruling that the Union failed to meet its burden of proving that CSR had actually consolidated the work centers.

At the hearing on November 20, 2003, the Arbitrator heard direct testimony on the issue of the tape-changing reassignment from the person who made the re-assignment Leon Fenn, the Communications, Operations and Maintenance Department Manager for CSR. Fenn testified that he decided in May 2002 to reassign tape changing duties from Comm Electronics to XY Tech Control. Doc. No. 18-9 (Arbitration Transcript) at 129, 154-56, 164-67. Although Comm Electronics employees do not normally work weekends, Tech Control employees normally do work weekends. Doc. No. 18-6 (Snyder Dep.) at 14. When asked to explain why Mr. Fenn reassigned this task from the Comm Electronics work center to the XY Tech Control work center, he testified:

> Q: There's a little green dot under CE117 [indicating the location of the tape recorders on a diagram that Mr. Fenn was asked to review], would you explain to the arbitrator why, as you said, you exercised your management prerogative to reassign that particular dot from one work center to another?
>
> A: Okay. These voice tape recorders here, are two little recorders similar to the higher technology's regular voice recorder tone; similar. And they run on a continuous basis, they run 24/7, and they record composite audio of all the circuitry on the Cape, all the networks, if you will, the net as we call them. And, typically, they run out of tape on a Saturday or Sunday morning, which previously required change. This CE person comes out and changes those tapes, but when the person comes out, this person gets four hours of pay just to change those tapes. Again, I looked at this as just inefficiency, a common sense approach to do things smarter and better. This area right here has 24/7 coverage, this one doesn't. And the equipment is similar in nature, it's the same – you know, the electronic technicians that does this work and does this work. So I took – I made the decision to go ahead and make that change to assign this piece of equipment over to tech control, thus not requiring a person to come in on the weekend because someone is there 24/7 to make this change.
>
> Q: How long does it take to change out a tape?
>
> A: Five minutes approximately.

Doc. No. 18-9 (Arbitration Transcript) at 164-65. When the Union's attorney asked Mr. Fenn about why he had transferred a job duty from one work center to another, the arbitrator refused to hear any more testimony on the subject because it was beyond the scope of the Union's grievance:

> Q: Just so I'm clear, that little green dot in the middle of the yellow [marking the location of the tape recorders], that is the work by – formerly performed by CE, now being performed by tech?
>
> A: Control.
>
> Q: Tech control. Is tech control only doing this on the weekends or are they doing it during the week?
>
> A: They are doing it whenever it happens.
>
> Q: Is that a result of new technology changes?
>
> A: This? No. It's just a matter of doing an existing process better, more efficient.

>THE ARBITRATOR: *We are spinning out of time on this. I don't have a grievance.*
>
>MR. SIWICA: Well, no further questions.
>
>THE ARBITRATOR: Thank you.

Doc. No. 18-9 at 166-67 (emphasis added).

The Arbitrator refused to take any more evidence on the subject of tape changes because he apparently found the evidence not relevant to the Union's grievance before him at the hearing. The Union claims that this suit was filed to enforce the arbitration award, not to challenge it, but it is undisputed that the Arbitrator heard testimony concerning the precise tape-changing issue raised in this lawsuit and rejected it. Despite direct testimony on the issue, in which Mr. Fenn candidly admitted that he had unilaterally decided to reassign the tape-changing duties, the Arbitrator found that "the Union had not established by a preponderance of the evidence that the Company actually implemented combination of the three work centers." Doc. 17-3 at 19. It is clear from the transcript that the Arbitrator refused to take any more evidence on the subject of tape changes because he did not find that evidence relevant to the Union's grievance. The Union's request to "enforce" the Award is ill-founded in the face of the tape-changing testimony that the Arbitrator implicitly rejected. Stated another way, this litigation is an inappropriate effort either to challenge or expand the Award. To the extent the Arbitrator authorized the possibility of a monetary award, he also specified the method to seek and determine such an award. To the extent the Union seeks something beyond this, it is not seeking to "enforce" the Award.

It is respectfully **RECOMMENDED** that IBEW Local 2088's Motion for Summary Judgment (Doc. No. 17) be **DENIED** and CSR's Motion for Summary Judgment (Doc. No. 18) be **GRANTED,** and that final judgment be entered accordingly.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on March 21, 2006.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy